# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

KING YOUNG BROWN,                                    PETITIONER

v.                                              No. 4:10CV91-B-V

STATE OF MISSISSIPPI                                 RESPONDENT

## MEMORANDUM OPINION

This matter comes before the court on the petition of King Young Brown for a writ of *habeas corpus* under 28 U.S.C. § 2254. The State has responded to the petition. Brown has not filed a traverse, and the time to do so has expired. For the reasons set forth below, the instant petition for a writ of *habeas corpus* will be denied.

### Facts and Procedural Posture[1]

King Young Brown is in the custody of Raymond Byrd, Warden of the Delta County Correctional Facility in Greenwood, Mississippi, after his conviction for manslaughter (Count I) and rape (Count II) in the Circuit Court of Washington County, Mississippi. State Court Record ("S.C.R."), Vol. 2, pg. 296. Brown was sentenced to serve twenty years on Count I and thirty years on Count II, to run consecutively in the custody of the Mississippi Department of Corrections. *Id.*

Brown appealed his convictions and sentences to the Mississippi Supreme Court, raising the following as grounds for relief (as stated by Brown through counsel):

I.      Whether the lower court erred in granting the State's manslaughter instruction marked and identified as S-6.

---

[1]The facts and procedural posture in this opinion are taken largely from the State's response to the petition, as these matters are not in dispute in this case.

II.     Whether the lower court erred in allowing the State to solicit testimony identifying King Young Brown, Jr. and [the victim][2] through microscopic hair comparisons.

III.    Whether the lower court violated King Young Brown, Jr.'s 6th Amendment right to confront his accusers when that court allowed the State to solicit testimony from a DNA analyst other than the analyst that actually conducted the DNA analysis.

IV.    Whether the verdict finding King Young Brown, Jr. guilty of manslaughter is against and/or inconsistent with the overwhelming weight of the evidence.

V.    Whether the lower court erred in overruling King Young Brown, Jr.'s objection to the admission of the State's photographs marked and identified as S-78, S-74, S-77, S-76 and S-79 on the basis that such photographs' probative value was outweighed by its prejudicial effect.

VI.    Whether the lower court erred in allowing the illegal seizure of King Young Brown, Jr.'s hair, blood and saliva samples thus violating the due process clause of the 4th, 5th, 6th and 14th Amendment of the United States Constitution and the Constitution of the State of Mississippi.

VII.    Whether the lower court erred in overruling King Young Brown, Jr.'s motion for directed verdict.

VIII.    Whether the lower court erred in denying Appellant, King Young Brown, Jr.'s motion for mistrial.

IX.    Whether the lower court erred in limiting King Young Brown, Jr.'s ability to cross-examine and/or impeach the State's fingerprint expert.

X.    Whether the court erred in dismissing an African-American juror from the jury.

XI.    Whether the verdict finding King Young Brown, Jr. guilty of forcible rape is against the overwhelming weight of the evidence.

The Mississippi Court of Appeals affirmed Brown's convictions and sentences. *Brown v. State*, 999 So.2d 853 (Miss. App. 2008), *reh'g. denied,* November 18, 2008, *cert. denied,* January 29,

---

[2] The victim was a minor and suffered a sexual assault prior to her murder. As such, in the interest of privacy, the court will not to refer to her by name.

2009 (Cause No. 2006-KA-315-COA).

Brown then filed an "Application for Leave to File Motion for Post-Conviction Relief" and accompanying "Motion for Post-Conviction Relief and Supporting Authorities," raising the following grounds for relief (as stated by Brown through counsel):

Issue One:    The prosecution committed prosecutorial misconduct by eliciting testimony that the prosecution knew was false.

Issue Two:    King Brown's appellate counsel provided ineffective assistance of counsel.

Issue Three:  The prosecution's presenting and arguing false evidence to the jury was so egregious as to require reversal under the plain error doctrine.

Issue Four:   King Brown was denied due process when the prosecution was allowed to present the DNA evidence via a witness who did not herself conduct the testing.

The Mississippi Supreme Court denied Brown's post-conviction motion, holding:

After due consideration, the panel finds that Brown's Application should be denied. The prosecutorial misconduct claim could have been raised on direct appeal and is, therefore, procedurally barred. MISS. CODE ANN. §99-39-21. Notwithstanding the procedural bar, the panel finds that the claim is without merit. Hence, where the panel finds no merit in the prosecutorial misconduct claim, there can be no viable ineffective assistance of counsel claim. Finally, Brown's claim that an intervening decision would have required a different result is also without merit where the circumstances regarding the defendant's right of confrontation in the *Melendez-Diaz* case are distinguishable from the facts in this case.

Brown then filed the instant federal petition for a writ of *habeas corpus*, raising the same four claims raised in his state court PCR with the additional allegation that "the evidence was insufficient as a matter of law to convict Brown." He has exhausted his remedies in state court, and the matter is properly before this court for *habeas corpus* review.

## Grounds One and Three: Procedurally Barred

The Mississippi Supreme Court held that the allegations of prosecutorial conduct found in Grounds One and Three of the instant petition for a writ of *habeas corpus* are procedurally barred under M<small>ISS.</small> C<small>ODE</small> A<small>NN.</small> § 99-39-21(1), as Brown did not raise these issues on direct appeal. The Mississippi Supreme Court order holds that these claims are barred under M<small>ISS.</small> C<small>ODE</small> A<small>NN.</small> § 99-39-21(1), which reads:

> Failure by a prisoner to raise objection, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.

"When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgement." *Sayre v. Anderson*, 238 F. 3d 631, 634 (5th Cir. 2001) (*citing Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2553-54, 115 L.Ed.2d 640 (1991); *Amos v. Scott*, 61 F.3d 333, 338-39 (5th Cir. 1995)).

Section 99-39-21(1) of the Mississippi Code is, indeed, an independent state procedural bar. *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997). The adequacy of the procedural bar depends upon "whether Mississippi has strictly or regularly applied it." *Id.* (*citing Lott v. Hargett*, 80 F.3d 161, 165 (5th Cir. 1996)). Brown "bears the burden of showing that the state did not strictly or regularly follow a procedural bar around the time of his appeal" and "must demonstrate that the state has failed to apply the procedural bar rule to claims identical or similar to those raised by the petitioner himself." *Id.* Brown has not done so; as such, defaulted his

federal *habeas corpus* claims in state court under an independent and adequate state procedural rule. *Id.* at 861.

The court may, however, review the merits of Brown's claims if he can show cause for his default and actual prejudice resulting from it. *See Coleman*, 501 U.S. at 750; *see also Martin v. Maxey*, 98 F.3d at 849 (*citing Sawyer v. Whitley*, 505 U.S. 333(1992)). The cause necessary to excuse procedural default "must be something *external* to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753 (emphasis in original). Some reasons constituting good cause for default include "interference by officials" and "a showing that the factual or legal basis for a claim was not reasonably available to [Petitioner]." *McClesky v. Zant*, 499 U.S. 467 (1991).

> So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington, supra*, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default.

*Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645 (1986).

Brown has argues that appellate counsel was ineffective for failing to raise on direct appeal that the prosecutor's misconduct (as alleged in Grounds One and Three) led to a constitutionally unfair trial. As discussed below in Ground Two, however, the Mississippi Supreme Court correctly ruled that no prosecutorial conduct occurred. As such, appellate counsel's decision not to raise that claim on direct appeal was reasonable. Therefore, Brown has proved neither cause nor actual prejudice, and he cannot overcome the procedural bar and have his *habeas corpus* claims reviewed on the merits.

Neither will a "fundamental miscarriage of justice" arise out of the court's decision not to review the merits of these claims. *See Martin,* 98 F.3d at 849 (*citing Sawyer v. Whitley,* 505 U.S. 333 (1992)). The "fundamental miscarriage of justice" exception is confined to cases "where the petitioner shows, as a factual matter, that he did not commit the crime of conviction." *Fairman v. Anderson,* 188 F.3d 635, 644 (5th Cir. 1999) (citing *Ward v. Cain,* 53 F.3d 106, 108 (5th Cir. 1995)). Indeed, to prove that he is actually innocent, Brown must present new, reliable evidence – not presented at trial – and prove that it was "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Fairman,* 188 F.3d at 644 (citations omitted). Brown has presented no such evidence (not reasonably available at trial) to support his claim of actual innocence. As made clear in the later discussion of Ground Two (regarding sufficiency of the evidence), trial counsel was aware of Brown's current allegation that the prosecution elicited testimony (not presented to the jury at trial) from the forensic hair analyst contrary to the DNA report from ReliaGene. S.C.R., Vol. 16, pg. 1861 and 1865. This claim is meritless, as discussed in Ground Two below. Given Brown's inability to overcome his procedural default, his claims of prosecutorial misconduct in Grounds One and Three will be dismissed.

**Grounds Two, Four, and Five: Reviewed on the Merits in State Court**

The Mississippi Supreme Court has already considered Grounds Two, Four, and Five on the merits and decided those issues against the petitioner; hence, these claims are barred from *habeas* review by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), unless they meet one of its two exceptions:

(d) An application for a writ of *habeas corpus* on behalf of a person in

custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* (emphasis added). The first exception, subsection (d)(1), applies to questions of law. *Morris v. Cain*, 186 F.3d 581 (5th Cir. 2000). The second exception, subsection (d)(2), applies to questions of fact. *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir. 1997). Since the petitioner's claims challenge both the application of law and the finding of fact, this court must consider the exceptions in both subsections.

Under subsection (d)(1), a petitioner's claim merits *habeas* review if its prior adjudication "resulted in a decision that was *contrary to*, or involved an *unreasonable application* of, clearly established Federal law." *Id.* (emphasis added). A state court's decision is *contrary to* federal law if it arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law, or if it decides a case differently from the Supreme Court on a set of "materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523 (2000). A state court's decision involves an *unreasonable application of* federal law if it identifies the correct governing principle but unreasonably (not just incorrectly) applies that principle to facts of the prisoner's case; this application of law to facts must be *objectively* unreasonable. *Id.* at 1521. As discussed below, the petitioner has not shown that the Mississippi Supreme Court unreasonably applied the law to the facts, or that the court's decision contradicted federal law. Accordingly,

the exception in subsection (d)(1) does not apply to Grounds Two, Four, and Five of the petitioner's claims.

Nevertheless, under § 2254(d)(2) these grounds may still merit review if those facts to which the supreme court applied the law were determined unreasonably in light of the evidence presented. Because the supreme court is presumed to have determined the facts reasonably, it is the petitioner's burden to prove otherwise, and he must do so with clear and convincing evidence. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000); 28 U.S.C. § 2254(e)(1). As discussed below, the petitioner has failed to meet this burden; as such, he cannot use subsection (d)(2) to move these claims beyond § 2254(d), which bars from *habeas corpus* review issues already decided on the merits.

### Ground Two: Ineffective Assistance of Counsel

In Ground Two, Brown argues that his appellate counsel was ineffective for failing to raise on direct appeal the claim of prosecutorial misconduct set forth in Grounds One and Three of the instant petition. Claims of ineffective assistance of appellate counsel are also governed by the standard laid out in *Strickland v. Washington*, 466 U.S. 668 (1984) (describing the standard regarding effectiveness of trial counsel). *See also, Evitts v. Lucey*, 469 U.S. 387, 397-399 (1985) (same standard applies to claim of ineffective assistance of appellate counsel). To prove that counsel was ineffective under the Sixth Amendment, a petitioner must prove that counsel's performance was deficient – and that the deficiency caused actual prejudice to the petitioner's defense. Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The court must analyze counsel's actions based upon

the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). To prove prejudice, petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir.), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997).

Brown argues that appellate counsel was ineffective for failing to argue that the prosecutor's conduct rendered his trial fundamentally unfair by eliciting certain testimony from Emil Lyon, a forensic hair comparison analyst with the Mississippi Crime Lab. Brown argues that the prosecutor elicited testimony from Lyon that several of the hairs recovered from Brown's home were microscopically similar to the victim's hair. Brown argues that a DNA test from ReliaGene Laboratories (which was not admitted into evidence at trial) was unable to match any of the recovered hairs to the victim, and, therefore, the prosecutor suborned perjury because he knew Lyon's testimony to be false. To put it mildly, Brown has grossly mischaracterized the facts – and has reached conclusions not supported by reason.

As the State has set forth the facts regarding this issue quite clearly (organizing the relevant test results into a table), the court will relay these facts nearly verbatim from the State's response to the instant petition. Brown has not challenged the accuracy of these facts.

Lyon conducted forensic hair comparisons on hairs recovered from several items of evidence for microscopic similarities. In addition, several of the hairs, which were recovered

from Brown's home, were also sent to ReliaGene for DNA testing, resulting in the generation of the report referenced by Brown in his habeas petition.[3]  However, Brown's statement that ReliaGene's report "could not match any hair found in the Spencer [defendant's] house to R.W. [the victim]," is simply wrong.  ECF doc. 1, pg. 1.  Paragraph 2 of the ReliaGene report, under the heading "Conclusions," reported that several of the hair samples "produced a mitochondrial genetic profile not consistent with the reference blood stain card of victim [R.W.]," paragraph 1 lists several *other* samples which "produced inconclusive or no results."  Exhibit C, pg. 1.  Further, while Lyon testified to personally comparing multiple hairs within each sample for microscopic similarities, the ReliaGene report indicates that only one (1) hair from each sample was tested for DNA results.  Hence, Brown's statement that "the mitochondrial DNA testing demonstrated conclusively that R.W.'s hairs were not found in the Spencer house," ECF doc. 1, pg. 15, is just wrong.  In truth, while the DNA testing was able to exclude the victim as the donor of several of the hairs recovered from Brown's residence, *several others produced inconclusive results, and many others were not tested at all*.  Given these results, it is irrational to conclude (as did Brown) that none of the hairs recovered from Brown's residence were the victim's.  On the contrary, the untested hairs and the hairs yielding inconclusive results may well have belonged to the victim.[4]  In an effort to demonstrate most clearly the correlation between Emil Lyon's

_____

[3] Although the report was not made part of the record, the State has stipulated that the court may use the report to analyze Brown's claims in Ground Two.

[4] In any event, Brown makes a serious error in relying on the ReliaGene report.  Contrary to Brown's belief, the report is solid proof that *the head hair and pubic hair found on the victim's t-shirt (Exhibit S-8B and S-11A) were, indeed, matched Brown's mitochondrial DNA.*  Exhibit C, pg. 2.  Indeed, 99.8% of the those of African and Caucasian descent, 99.6% of those of Hispanic and Asian descent, and 99.1% of those of Native American descent were excluded as the donor of those hairs.  Brown could not, however, be excluded.

testimony and the ReliaGene results, the court offers the following chart (which the State

provided in its Response):[5]

| Exhibit No./ ReliaGene No. | Description | Emil Lyon's testimony as to what comparisons revealed | Excluded ReliaGene Report |
|---|---|---|---|
| S-16 / 03-18421-A and 03-18421-B | Several hairs and one (1) fiber from the outer surface of the inner plastic bag containing the victim's body [S.C.R.,Vol. 16, pg. 1839] | - Pubic hairs microscopically similar to Brown's<br><br>-one (1) head hair fragment microscopically similar to victim's<br><br>- hairs and fragments insufficient for comparison [*Id.* at 1840] | - 03-18421-A was "Hair A" from a slide with three (3) hairs and 03-18421-B was "Hair B" from the slide with three (3) hairs<br><br>- both 03-18421-A and B produced a mitochondrial genetic profile that was not consistent with the victim's reference blood stain card<br><br>- both 03-18421-A and B produced a mitochondrial genetic profile which were consistent with Brown's reference blood stain card<br><br>- no mention of third hair on slide |

[5] In the interest of clarity, the court has included in the chart below only the items of evidence containing hairs which Lyon found to be microscopically similar to the victim's hair. Lyon also testified to multiple items of evidence which produced no usable hair comparisons and several items, obtained from the defendant's residence, which contained only Brown's hair.

| | | | |
|---|---|---|---|
| S-19 / 03-18420 | white plastic garbage bags from Brown's laundry room [*Id.* at 1842] | - one (1) head hair not similar to either Brown's or the victim's<br><br>- one (1) head hair microscopically similar to Brown's<br><br>- head hair fragments microscopically similar to victim's<br><br>- hairs insufficient for comparison<br><br>- animal hairs, fibers and plant material [*Id.* at 1842-44] | - indicates that 03-18420 was a slide containing these hairs<br><br>- no reference that these hairs were ever tested |
| S-28 / 03-18426 | white pullover shirt recovered from the dirty laundry in Brown's bedroom [*Id.* at 1852] | - one (1) head hair fragment microscopically similar to victim's<br><br>- hairs and fragments insufficient for comparison<br><br>- fibers [*Id.* at 1852-53] | - indicates that only "Hair 1" from a slide containing seven (7) hairs was tested<br><br>- 03-18426, "Hair 1," produced inconclusive or no results<br><br>- no mention of the other six (6) hairs contained on the slide |

| S-31 / 03-18429 | tennis shoes recovered from Brown's residence [*Id.* at 1854-55] | - one (1) head hair microscopically similar to Brown's<br><br>- one (1) pubic hair microscopically similar to Brown's<br><br>- head hair fragments microscopically similar to victim's<br><br>- animal hair and fibers | - indicates that only "Hair 4" from a slide containing five (5) hairs was tested<br><br>- 03-18429, "Hair 4," produced inconclusive or no results<br><br>- no mention of the other four (4) hairs contained on the slide |
|---|---|---|---|
| S-32 / 03-18425 | lint collected from lint filter in dryer in Brown's residence [*Id.* at 1856] | - one (1) pubic hair microscopically similar to Brown's<br><br>- one (1) head hair and hair fragments microscopically similar to victim's [*Id.* at 1856] | - indicates that only "Hair 2" from a slide containing five (5) hairs was tested<br><br>- 03-18425, "Hair 2," produced a mitochondrial genetic profile that was not consistent with the victim's reference blood stain card<br><br>- 03-18425, "Hair 2," produced a mitochondrial genetic profile that was consistent with the mitochondrial genetic profile of Brown<br><br>- no mention of the other four (4) hairs contained on the slide |

| S-36 / 03-18-427 | multiple hairs collected from a mop head which swabbed the laundry room of Brown's residence [*Id*. at 1857] | - head hair and head hair fragments microscopically similar to victim's<br><br>- pubic hairs microscopically similar to Brown's<br><br>- one (1) dyed gray head hair and hairs and fragments insufficient for comparison [*Id*. at 1858] | - indicates that only "Hair 1" from a slide containing 2 hairs was tested<br><br>- 03-18427 produced a mitochondrial genetic profile that was not consistent with the victim's reference blood stain card<br><br>- no mention of the other hair contained on the slide |

Lyon compared microscopic characteristics of multiple hairs from each sample, while ReliaGene analyzed only one hair from each sample tested (except for S-16, from which ReliaGene tested two hairs). Moreover, in the ReliaGene report, several hairs produced inconclusive results, and many others were not included at all. Therefore, one could not rationally conclude from the record and the report whether (for a given result) Lyons and ReliaGene analyzed the same hairs. Brown has, therefore, failed to prove that the prosecutor knowingly elicited false evidence from Lyon.[6] For these reasons, appellate counsel was reasonable in deciding to raise on direct appeal the claim of prosecutorial misconduct, as the claim was frivolous. In any event, appellate counsel is not required to raise every colorable claim

---

[6]The court is troubled by counsel's failure to make this simple distinction: an analysis failing to attribute a hair to the victim is *not* the same as an analysis definitively excluding the victim as the hair's donor. In the first example, one can draw no conclusion as to the donor of the hair; in the second, one can conclude that the victim is *not* the donor. This distinction is the most basic form of deductive reasoning.

The court is further troubled by counsel's decision to use this flawed logic to argue that a prosecutor suborned perjury – a serious allegation, requiring serious reflection – reflection lacking in this case.

on appeal, let alone meritless grounds. *Jones, supra*. Brown's claim in Ground Two of the instant petition is without merit and will be dismissed.

## Ground Five:  Insufficiency of the Evidence[7]

Brown argues in Ground Five that the evidence against him was insufficient to support the jury's verdict.  A challenge to the sufficiency of the evidence can support a claim for *habeas corpus* relief only if the evidence, when viewed in the light most favorable to the State would lead no reasonable fact finder to find that the State proved "the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also Marler v. Blackburn*, 777 F.2d 1007, 1011 (5th Cir. 1985).  This standard of review "preserves the integrity of the trier of fact as the weigher of the evidence." *Bujol v. Cain*, 713 F.2d 112, 115 (5th Cir. 1983). Indeed, this standard allows the trier of fact to convict the defendant even if "the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gilley v. Collins*, 968 F.2d 465, 468 (5th Cir. 1992).  As set forth below, the State adduced a vast array of evidence against Brown – more than sufficient to sustain his conviction.  Thus, Brown's allegations in Ground Five are overwhelmingly contradicted in the record – and are thus frivolous.

The jury heard testimony from Cynthia Webster, the victim's mother, that she and the victim arrived at the Merrill house [the victim's grandparent's house which was next door to Brown's residence] around 4 p.m. on April 20, 2002, the day of the murder, and the victim went across the street to the park to play.  S.C.R., Vol. 10, pg. 921.  Sometime thereafter, Webster took

_____

[7]Again, as the State's recitation of the evidence introduced at trial is uncontradicted (and well-supported in the record), the court has reproduced it nearly verbatim.

the victim to Sonic to get some dinner, the victim ate some french fries and ice cream and went back to the park and Webster nodded off folding clothes. *Id.* at 929-932. When Webster awoke, the victim was missing. *Id.* at 932. Oscar Merill, Sr., the victim's grandfather, testified that when he left the Merrill residence around 6:30 or 6:45 p.m., Cynthia Webster was asleep and there no one was in the park. S.C.R., Vol. 11, pp. 1145-47. Addie Cannon, the victim's aunt, testified that she began searching for the victim once she was informed of her disappearance, continued the search until 4 a.m. and did not observe any cars riding around the neighborhood, anyone walking the streets or anyone go into Brown's yard. S.C.R., Vol. 10, pg. 1021. In addition, Valacia Carson, another of the victim's aunts, testified that she was out in the driveway of the Merill's house from midnight or 1 a.m. to daybreak and did not see any cars turn toward the house or observe anyone carrying a garbage bag. S.C.R.,Vol. 11, pg. 1044. Carson also testified that she and her mother drove by the park around 4:45 p.m. and saw the victim on the swings. *Id*. at 1038. This was corroborated by Bernice Merrill, the victim's grandmother and Carson's mother. *Id*. at 1120. Further, Emma Brown, the victim's great aunt, testified that she arrived at the Merrill house after 11 p.m. and remained outside all night, but she did not notice any traffic stopping at Brown's residence. *Id*. at 1096.

In addition, Officer Jason Jenkins testified that he knocked on Brown's residence between 6 a.m. and 7 a.m. on April 21, 2002, received no answer, and, thereafter, around 8:30 a.m., looked in the garbage can at Brown's residence and saw a large, heavy white garbage bag, although he did not suspect anything sinister at the time. S.C.R., Vol. 12, pp. 1183-1184. Officer Jenkins further testified that he left the scene around 2:45 p.m., but returned around 3:00 p.m. after receiving a call on his radio. *Id*. at 1185-86. Officer Jenkins was informed that the

victim's body had been found and was asked to verify whether the garbage can looked the same as it had earlier that day. *Id.* at 1187-88. Officer Jenkins testified that the same garbage bag was in the can, and, at that point, had a cut in it revealing the victim was inside. *Id.*at 1189. Officer James Whitehead testified that he was initially approached by Brown's step-father, Leon Spencer, to investigate the garbage can because it contained a bag which neither he nor his wife had put into it. *Id*. at 1222. Officer Whitehead further testified that Brown's step-father obtained a knife, and the officers cut a small hole in the garbage bag revealing that there were two (2) bags and inside the second was the victim's body. *Id*. at 1228. The garbage can was then taped off and the scene guarded until the crime lab came to take possession of the evidence. *Id.* at 1230. The jury was taken to the crime scene and able to observe the areas where the garbage can was located, where the victim's family was sitting, as well as their line of vision to Brown's residence, and the points of entry into Brown's property. *Id*. at 1252-1270.

Officer Edward Crockett corroborated Officer Whitehead's testimony about the discovery of the body. In addition, Crockett testified that he searched the area around the garbage can for wheel marks indicating that the heavy garbage can had been dragged from a different location and found none. S.C.R., Vol. 13, pg. 1318. Further, Officer Crockett testified that, upon the discovery of the victim's body, Brown's mother stated that there were similar garbage bags in her storage shed. S.C.R., Vol. 12. at 1307. However, David Zeliff, Section Chief of the Mississippi Crime Lab, testified that when the shed was searched it was locked and no white garbage bags were found. S.C.R., Vol. 13, pp. 1397 and 1408. Officer Ricky Spratlin testified that the search of the shed revealed no signs of forced entry. S.C.R., Vol. 15, pg. 1675. Zeliff further testified that he recovered hairs from the outer surface of the inner garbage bag holding the victim's body

near the bottom of the bag.  S.C.R., Vol. 13, pp. 1366-68.  Later in the trial, Amrita Lal-Patterson, lab manager at ReliaGene Laboratories, testified that her lab tested two (2) of the hairs found on the inner bag and they were consistent with Brown's genetic profile.[8]  S.C.R., Vol. 17, pg. 1964.  She also testified that the genetic profile of one hair, which was consistent with Brown's, occurs with a frequency of 1 in 575 trillion Caucasians, 1 in 19.6 trillion African-Americans and 1 in 6.56 quadrillion Hispanics, while the other hair, which was consistent with Brown's genetic profile, would occur in 1 in 140 quadrillion Caucasians, 1 in 13.1 quintillion African-Americans and 1 in 198 quadrillion Hispanics.  *Id.* at 1971.  She further stated that the population of the entire world was a little over 6 billion people.  *Id.*  On cross-examination, Zeliff was asked questions seeking to imply that the hair found on the inner bag could have floated in on the wind.  S.C.R., Vol. 13, pp.1446-48.  On redirect, Zeliff indicated that in his thirty (30) years of experience he had never encountered a case where a pubic hair had floated into a crime scene on the wind.  *Id* at. 1472.  Zeliff also stated that he was 5 feet 10 inches tall and around 185 pounds and was able to lift the garbage bag alone in order to examine it, indicating that a single person could have carried the bag.  *Id.* at 1441.

In addition, the jury heard from Officer Andrew Kaho that he took fingerprints of all the individuals who were in Brown's residence on the day of the murder and all those who were in the Merrill home.  S.C.R., Vol. 14, pp. 1481 and 84.  In addition, Officer Kaho testified to collecting prints from an individual whose name came up in the investigation and pulling prints which were on file from another individual.  *Id*. at 1487-88.  Officer Ricky Spratlin testified that

---

[8] This particular DNA evidence was not suppressed, although the ReliaGene report mentioned earlier was suppressed and not offered at trial.

he carried all of the fingerprint cards collected by Officer Kaho to the crime lab. S.C.R, Vol. 15, 1685. Further, John Byrd, who was employed as a fingerprint analyst with the Mississippi Crime Lab at the time of the crime, testified that ten (10) items of evidence were submitted to him for testing, and that he had been provided with thirteen (13) known fingerprint cards for comparison. S.C.R., Vol. 14, pg. 1552 and 54. Byrd testified that he developed a latent print off the exterior garbage bag containing the victim's body just above the tape closure. *Id.* at 1553 This bag was admitted as Exhibit S-19-(A). *Id.* at 56. Byrd testified that this latent print, L-1, was "a positive identification with the left little fingerprint of King Y. Brown, Jr." *Id.* at 1566. In addition, Byrd stated that he tested several white plastic bags recovered from the laundry room in Brown's residence which were admitted as Exhibit S-34. *Id.* at 1568 and 71. Byrd testified that a print lifted from those bags, L-2, was "a positive identification with the right middle finger of King Y. Brown, Jr," and another print lifted from those bags, L-3, was "a positive identification with the left middle fingerprint of King Y. Brown, Jr." *Id.* at 1573.

Dr. Steven Hayne, the forensic pathologist who conducted the autopsy, testified that the victim's vaginal injuries were consistent with penetration. S.C.R., Vol. 16, pg. 1772. Dr. Hayne further stated that he found 200 cc's of fluid in the small bowel which were consistent with a meal of french fries and ice cream and would indicate that the victim died within one (1) to two (2) hours of consuming the meal. *Id.* at 1773. Dr. Hayne testified that, based on the victim's facial injuries and the absence of other findings, cause of death was suffocation. *Id.*

Joe Andrews, a trace evidence specialist with the Mississippi Crime Lab, testified that the tape on the bags containing the body was consistent in color, width and texture to tape found in Brown's residence. S.C.R., Vol. 17, pg.1934. Andrews also testified that the garbage bags

holding the victim's body were "consistent in all physical and chemical characteristics" to the garbage bags found in Brown's residence and "they cannot be excluded as having originated from the same source." *Id*. at 1938. Further, the jury heard from Brown's mother, Gloria Spencer, on cross-examination that the unique garbage bags, which were found in her home and which contained the victim's body, were given to the family by her brother-in-law who lived in Arkansas. S.C.R., Vol. 18, pg. 2083.

In addition, on cross-examination, Brown's step-father Leon Spencer, testified that the doors of their residence were armed with an alarm system which issued a chime when a door was opened, but that the back door did not have any such sensor on it. *Id.* at 2187. In addition, Leon Spencer testified that his father, who Brown was home alone with at the time of the disappearance and murder, was 89 years old, somewhat hard of hearing and recovering from a heart attack at the time of the crime. S.C.R., Vol. 19, pg. 2220. Willie Spencer, Leon Spencer's father, testified that, at one point in the evening, "[Brown] was in the kitchen, and so I went to the restroom, and I come out of the restroom and goes and sits down, and he came after awhile, about twenty minutes. He come back and sat down beside of me, but the little girl was gone from over at the swings back over yonder where the other little girls was at." *Id*. at 2296.

The State then called several rebuttal witnesses, including Brown's neighbor Santore Cole, who had given police a recorded statement that he saw Brown place something in his trash can around 5:30 p.m. on the night of the murder. At trial, Cole indicated that he had seen Brown do so much earlier in the afternoon. S.C.R., Vol. 20, pg. 2379. However, a tape of Cole's recorded statement was played for the jury, and Cole verified that it was his voice on the tape. *Id*. at 2380.

Given the voluminous evidence of Brown's guilt, even in the absence of Lyon's testimony regarding the forensic hair comparisons, the prosecution presented the jury with sufficient evidence to support Brown's conviction. The jury considered the short time frame of between 4:45 p.m. on April 20, 2002, when the victim was seen by her aunt and grandmother and 6:45 p.m. on April 20, 2002, when her grandfather left the house and did not see her. They heard the recorded statement of Brown's neighbor Santore Cole that he had seen Brown put something in the trash around 5:30 p.m. Multiple witnesses testified that no one was seen coming or going from the Brown residence from the time it was discovered the victim was missing until the next day when the body was found. The jury observed the scene and saw for themselves the location of the can, the backyard and the points of view of the various witnesses. The victim was found in the Browns' garbage bag, double wrapped in unique garbage bags obtained by Brown's family from a relative in Arkansas. Brown's *pubic* hair was found in between the two bags holding the victim towards the bottom of the bag, and DNA Genetic analysis proved that the hairs matched Brown's genetic profile to the exclusion of an overwhelming portion of the potential population. Brown's fingerprints were found both on the outer bag containing the victim and the similar bags in his family's laundry room. The forensic pathologist testified that the victim's injuries were consistent with vaginal penetration and that she died of suffocation. The jury observed the testimony the witnesses and weighed their credibility.

Based upon this overwhelming evidence, a juror could readily conclude beyond reasonable doubt that Brown committed the crimes of his conviction. Brown's claim for relief in Ground Five of the instant petition will therefore be dismissed as frivolous.

### Ground Four: Introduction of Testimony Regarding Test Results
### from a Witness Who Did Not Personally Conduct the Tests

In Ground Four, Brown claims that he was denied due process when the prosecution

presented DNA evidence through Amrita Lal-Paterson who did not personally conduct the tests

herself. The Mississippi Court of Appeals rejected this claim on the merits during direct appeal,

holding :

> Brown argues his right to confront his accuser was violated in this case because the DNA analyst who testified was not the analyst who performed the tests. Brown argues that under *McGowen* [*v. State*, 859 So.2d 320 (Miss. 2003)], it is a violation of his Sixth Amendment right of confrontation since Chris Larson, who originally performed the test, was able to testify, but did not. The State contends that the DNA expert Amrita Lal-Paterson was a qualified expert and was properly allowed to testify regarding the DNA evidence. [S.C.R., Vol.17, pg. 1953].

> In this case, Paterson was the laboratory manager at ReliaGene Technologies, a private laboratory in New Orleans, Louisiana. Paterson, in her duties as manager, trains the laboratory analysts, reviews the analysts' work, conducts tests, and testifies in court when necessary. [*Id*. at 1951] Paterson is certified as an expert in the field of forensic science, specializing in DNA analysis. Paterson did not perform the tests on the DNA found at the scene, but she was the laboratory manager at the time the tests were performed. [*Id*.] Paterson also testified at trial that although she did not perform the testing, she did review the work of Chris Larson, the analyst who actually performed the tests. [*Id*. at 1959] In addition, Paterson testified that she further made her own analysis of the work performed by Larson. [*Id*.] In formulating her own analysis, Paterson reviewed the entire file and the test results to reach her own conclusions on the DNA testing. [*Id*. at 1960] Paterson completed her own report and then compared her conclusions and report with Larson's. [*Id*.]

> Paterson testified regarding the DNA testing performed on two of the four hairs presented to ReliaGene Technologies by the Mississippi Crime Laboratory. She testified that DNA tests were performed on those two hairs because they contained root material sufficient for testing. [*Id*. at 1965-66] DNA was extracted from these two samples and then DNA was extracted from reference samples from both R.W. and Brown. [*Id*.] Paterson testified that the lab performed identical tests on those samples and then compared the reference sample results to the other hair samples provided. [*Id*.] The purpose of performing these tests was in order to determine if either R.W. or Brown could be included or excluded as a

donor to the hairs provided. R.W. was excluded as a possible donor of the two hairs samples. [*Id*. at 1968] However, Paterson testified that Brown could not be excluded as a possible donor of the two hairs tested. [*Id*. at1969] Paterson opined that one hair sample gave results for eleven of the thirteen markers which the lab tested, and the test results showed that the genetic profile of the DNA donor in that sample occurs with a frequency of occurrence of one in 19.6 trillion. [*Id*. at 1970-71] The other hair sample gave results for all thirteen markers tested, and the genetic profile of the DNA donor in that sample occurs with a frequency of occurrence of one in 13.1 quintillion. [*Id*. at 1971]

In this case, Brown complains that his Sixth Amendment right to confront his accuser has been violated since the analyst who actually performed the test did not testify at trial. However, Paterson, the expert who did testify at trial, actively participated in the analysis, forming her own opinion report on the DNA samples tested. She was also a laboratory manager at the time the tests were taken and was directly involved with checking the work of each analyst, and in fact performed checks on the tests run by Larson. Further, the DNA expert, Paterson, "is not so far removed from the process as to be reduced to the level of a records custodian." *Adams v. State*, 794 So.2d 1049, 1057-58 (¶ 24) (Miss.Ct.App.2001). This Court agrees with the trial court's determination that Paterson was sufficiently involved with the analysis and overall process so as to avoid violating Brown's Sixth Amendment right of confrontation. This issue is without merit.

*Brown*, 999 So. 2d at 860-861.

Brown notes that five months after the Mississippi Supreme Court denied certiorari review on this issue, the United States Supreme Court decided *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 164 L.Ed.2d 314 (2009). He argues that *Melendez-Diaz* requires reversal of his conviction because "when the prosecution presents the results of laboratory testing through a witness who did not perform the tests," the prosecution has denied the defendant his Sixth Amendment right to confront a witness against him. ECF doc. 1, pg. 28. On post-conviction collateral review, the Mississippi Supreme Court held that "the circumstances regarding the defendant's right to confrontation in the *Melendez-Diaz* case are distinguishable from the facts in this case." The Mississippi Supreme Court was correct in so distinguishing Brown's case from

*Melendez-Diaz*.  In *Melendez-Diaz*, the prosecution submitted only "certificates of analysis"

affirming that the substance seized was cocaine – and did so without calling a single witness to

support that documentation.  *Melendez-Diaz*, 129 S.Ct. at 2531.  The Supreme Court held that,

"[a]t the time of trial, petitioner did not know what tests the analysts performed, whether those

tests were routine, and whether interpreting their results required the exercise of judgment or the

use of skills that the analysts may not have possessed."  *Id.* at 2537.  In conclusion, the Supreme

Court held that "[t]he Sixth Amendment does not permit the prosecution to prove its case via *ex

parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was

error."  *Id.* at 2542.  The *Melendez-Diaz* Court made no finding the propriety of calling a lab

manager who oversaw the testing and conducted independent analysis of the findings – as

occurred with Amrita Lal-Paterson in the present case.

     The present case presents a situation distinguishable from that in *Melendez-Diaz*.  Unlike

Melendez-Diaz who was faced with only affidavits (thus with no chance for explanation or cross-

examination regarding the test results), Brown had the opportunity to question Lal-Paterson, who

had personally conducted an independent analysis.  Brown could, and did, confront Lal-Paterson

regarding her testimony.  Thus, the Mississippi Court of Appeals properly held that no

constitutional violation occurred through use of Lal-Paterson to present the test evidence, and the

Mississippi Supreme Court properly the *Melendez-Diaz* case during its analysis of the issue.

Therefore, as to this issue, the decisions of the Mississippi Court of Appeals and Mississippi

Supreme Court were neither contrary to, nor did they involve an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United States.

Further, these decisions were not based on an unreasonable determination of the facts in light of

the evidence.  As such, Brown's claims for *habeas corpus* relief Ground Four will be dismissed with prejudice.

In sum, all of Brown's claims in the present petition for a writ of *habeas corpus* will be denied.  A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED,** this the 20th day of September, 2011.

/s/ Neal Biggers
NEAL B. BIGGERS
SENIOR U. S. DISTRICT JUDGE